2013 Ark.App. 274

**Tammie DRAKE and Virgil Drake, Appellants**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES and Minor Children, Appellees.**

**No. CA 13–5.**

Court of Appeals of Arkansas.

April 24, 2013.

Deborah R. Sailings, Arkansas Public Defender Commission, for appellants.

Tabitha B. McNulty, Office of Chief Counsel, for appellee Arkansas Department of Human Services.

Chrestman Group, PLLC, by: Keith L. Chrestman, for appellees B.D. and K.D.

KENNETH S. HIXSON, Judge.

Tammie and Virgil Drake bring this appeal from an order of the Sebastian County Circuit Court terminating their parental rights to their minor children, B.D. (born March 10, 2005) and K.D. (born February 12, 2003). Appellants contend that insufficient evidence exists to support the court's ruling that it was in the children's best interest to terminate their parental rights. We disagree and affirm.

### Drakes' Six–Year History with DHS

The Drakes have a long history with the Arkansas Department of Human Services (hereinafter DHS). In October 2006, DHS filed a petition for emergency custody, alleging that the two minor children were dependent-neglected. The children were placed on a seventy-two-hour hold under an order for emergency custody. The court subsequently found the juveniles to be dependent-neglected and ordered DHS to make a trial placement of the children with Virgil so long as Tammie did not live in the house and so long as she was not relied upon as caregiver; that Virgil was to prove that he had childcare arrangements while he was at work; that the juveniles were not to be left alone in the care of Tammie; and that Tammie was to submit to a drug-and-alcohol assessment and follow-up treatment as recommended. The court also issued a restraining order against a family acquaintance, Paul Mashburn, Jr., a registered level-three sex offender, stating that he should have no contact with the juveniles. The court stated that the goal in the case was family preservation.

Less than nine months later, on July 18, 2007, DHS filed a petition for emergency change of custody asking the court place custody of the minors in the care of DHS. The ensuing investigation revealed Virgil had moved without notifying DHS, that he was living with Tammie and allowing her to have unsupervised visits with the juveniles, that he was possibly drinking again, that Tammie was bringing men into the home after Virgil left for work while the children were in the home, that Tammie was drinking, and that Mashburn had been in contact with the children again. After a seventy-two-hour hold, the children were returned to the custody of Virgil and the court ordered the maternal grandmother, Bunny Taylor, to be the caregiver when Virgil was not home. It also allowed Virgil to make arrangements with a licensed daycare but ordered that no one else was to provide care for or babysit the juveniles. Tammie was not allowed to have any unsupervised time with them, and the grandmother was to be the only person allowed to stay overnight. The court again ordered that no contact was allowed between Mashburn and the children. In January 2008, after a review hearing, the court found that the parents had complied with orders of the court and returned custody of the children to the parents.

In May 2010, another petition for emergency custody was filed in which DHS stated that the Fort Smith Police Department found Tammie to be extremely intoxicated and had been in a physical altercation and was unable to care for her children. She was placed under arrest for endangering the welfare of a minor. The children were removed from the home and adjudicated dependent-neglected. In December 2010, the court held a review hearing and found that the parents had stable housing and Virgil had stable employment with sufficient income, and that the mother had completed parenting

classes and her drug screens were negative. However, the court kept custody of the children with DHS.

A permanency-planning hearing was held in May 2011, and the children remained in the custody of DHS. The court found that appellants were complying with the established case plan and orders of the court. The court stated that the children should be returned home to the parents in a time frame consistent with their developmental needs but no later than three months from the date of the permanency-planning hearing. However, less than one month later, an order was entered in which it was found that Tammie, who it stated had significant mental illness, was not taking her medications.

At the fifteen-month review hearing, the court again returned the children to the parents but ordered that DHS was to maintain its case as a protective-services case and the goal of the plan was still family preservation. At the hearing, Tammie was pregnant and the court expressed its concern that she would not be able to take her medications during pregnancy. In February 2012, the court noted that it had concerns regarding the children's school attendance and the mother's refusal to take medication for her diagnosed bipolar disorder.

Only one month later, DHS filed another motion for ex-parte change of custody, alleging that circumstances had changed since the children had been returned to their parents. It alleged that Tammie "was so mentally unstable as to be incoherent and unable to provide care for the safety of the juveniles." The petition stated that Virgil was working in Oklahoma and would stay there for multiple days at a time and was not available to care for the children. It noted that this was the fourth time that the children had been placed in

foster care. DHS was again given custody, and the court ordered parental visitation to be in-home and overnight only as long as Virgil was present and that the children were not left alone in the care of the mother. In April 2012, the children were again adjudicated dependent-neglected.

DHS subsequently filed a petition for termination of parental rights in June 2012. The grounds for the petition included: that the children had been out of the custody of the parents for twelve months and despite a meaningful effort by the department to rehabilitate or correct the conditions that caused removal, the conditions had not been remedied; that the parents had willfully failed to provide significant material support; that Tammie had failed to attend appointments for treatment; that Tammie had failed to take prescribed medication for her mental illness; that Tammie had shown an indifference to remedying her mental health; that Virgil had failed to provide a safe and appropriate home that protects the children from Tammie's mental illness; and that Tammie had been unsuccessful in reunifying with her other children in Nebraska and had her rights terminated to four other children.

### The Termination Hearing

A hearing was held on the petition to terminate. Tammie testified that she was receiving treatment for bipolar disorder. She stated that she and Virgil had moved to a new house one month ago but that they were going through a divorce. She stated that the house was not ready for the children and that she had not unpacked their things. She stated that the State of Nebraska had previously terminated her rights to four of her other children. She acknowledged that B.D. and K.D. had been in the custody of DHS and had been in and out of the home. She also stated that she had missed visitation with her children three times in a row while they were in the custody of DHS.

Tammie also testified that she was not working but wanted to. She said her plan was to sign up for food stamps and that she had picked up a form the day before the hearing. She acknowledged her recent arrest for driving while intoxicated, serving jail time, and having her license taken away. She stated that she was "pretty wasted" that night. She also acknowledged spending time in a mental hospital and receiving counseling services through DHS.

Virgil testified that he was not currently employed because he had been injured on his former job and could not work. He was in the process of applying for workers' compensation. If he did return to work, he stated that his job would require him to leave home at 3:30 a.m. and return at 7:30 p.m. and that he would work a week, then be off a week. He stated that when he was working, Tammie would supervise the children and that if Tammie were not doing well, his daughter, who lives in Nebraska, had offered to care for the children. Virgil also testified that he and Tammie recently had a new baby, born in Oklahoma.[1]

Virgil testified that he had completed counseling and that he was thinking of getting a divorce in order to regain custody of his children. He testified that he knew he was not supposed to allow Tammie to have unsupervised time with the children. But he stated that it was his

---

1. This new baby was taken into protective custody by DHS of Oklahoma and is not a party to this litigation.

opinion that even if Tammie did not take her medication, she would not jeopardize their children if she had supervision of them. He also said that they had missed at least six visits with the children recently when they were in DHS custody. He acknowledged a problem with alcohol. He stated that after Tammie was released from the mental hospital, her mental health was improved.

Dr. Nancy Powell, a clinical psychologist, evaluated Tammie and Virgil. She diagnosed Tammie with a personality disorder. She tested the couple and found that the results from the tests showed alcohol abuse being significantly elevated and found the couple to be rigid in their parental skills. She testified that she did not think Tammie would understand the needs of her children, but rather that she would be focused on herself and what her needs were; that she would have problems understanding the children's developmental needs and that she would have trouble coping with stress. She also was fearful that Tammie would use alcohol as a means of coping with unpleasant emotions. She stated, "My belief is with the amount of time that this case has been going on, the amount of services received, the amount of classes taken, and to find no better parenting skills than I found on . . . I have doubts that that's going to improve."

Todd Blaylock, who had been the assigned caseworker for the appellants' case, testified that appellants had not been consistent with visitation and that it had been a long stretch of time since they had seen the children. He stated that although he had photos of the new home, neither of the Drakes were employed and had done nothing to establish that they were ready to have custody of their children. He stated that a high probability existed that something would happen to the children because of Tammie's mental illness, and because of her alcoholism problems coupled with inadequate supervision. Blaylock also testified that the children had been in and out of DHS custody but that collectively they had been in foster care for at least two years. He felt that the problem with the couple regaining custody of their children was based on the mother's long-term mental-illness issues that had not been dealt with and Virgil not understanding Tammie's need for treatment. He stated, "I believe the mental health issues and the substance abuse issues and the lack of understanding from Mr. Drake about the dangerous issues pose are still present in the family." He stated that he felt DHS had exhausted everything that it could as far as resources for the family.

Charles Pennington, a licensed master social worker and therapist on behalf of Tammie, testified that she had very severe symptoms of bipolar disorder but that, after she was treated recently in the mental-health hospital, her symptoms improved. He stated that her improvement was due to proper medication. He also stated that he did not believe that she had any problems with alcohol but that it was a characteristic of bipolar disorder to drink every once in a while. He said that she was taken from jail directly to the mental hospital because that was the only possibility for her to get better. He was pleased with how well she had responded to the treatment. He acknowledged that without her medication, she is severely manic most of the time. He also stated that she had had lapses in taking her medication.

After considering the above testimony, the court entered an order finding clear and convincing evidence existed to terminate the appellants' parental rights. Specifically, it found that the children had been out of the home for more than twelve months; that Tammie had moved and had not maintained a stable residence; that the

family had no income at the time and that neither parent had a job and future possibilities of employment at the time; that Tammie had no driver's license and no transportation; that Tammie and Virgil had missed a significant number of visits with the children; that Tammie had been arrested for DWI and had recently been committed to a mental-health facility; that the substance-abuse issues in the home had not been resolved; that Virgil resided with Tammie and had not maintained stable housing; that if Virgil obtained the job he was seeking, he would be gone sixteen hours a day and Tammie would be the primary caregiver for the children; and that Virgil had failed to recognize that Tammie presented a risk of harm to the children when she was left in charge. The court noted that there was a likelihood that the children would be adopted if the termination petition were granted.

### The Appeal

Appellants bring this appeal contending that the trial court erred in terminating their parental rights because insufficient evidence exists to support the finding that it was in the children's best interest to terminate their parental rights.

Appellants concede that with respect to Tammie, grounds for termination exist in that she had her rights to four other children involuntarily terminated, but argue that it is not in the best interest of the children in this case to have her parental rights terminated. They argue that Virgil's rights should not have been terminated based upon the findings by the court that he neither remedied Tammie's mental-health issues nor provided stable housing and income. They argue that the real reason for terminating Virgil's rights was not because of Tammie's mental-health issues, but rather because he had lost his job and thus his family income. They argue-that preceding Virgil's injury on the job, he had provided stable housing and income. They also argue that the children had always done well, that they have a stable marriage, and that Virgil was hardworking and consistently employed. They contend that his job loss was of no fault of his own.

As for Tammie, they acknowledge her history with bipolar disorder but argue that she had not been properly treated for it. Once she began receiving proper treatment, she responded well. They argue that together they can provide for the safety and welfare of the children, despite one of them having limitations. In addition, they contend that no testimony or evidence was presented that the children were poorly adjusted or had been physically or emotionally abused. Rather, they had attended school, remained in their appropriate grades, and made good grades.

The appellants ask this court to remand the case and direct DHS to offer reunification services so that they can have additional time to demonstrate that they can overcome adversity due to Virgil's on-the-job injury. They ask for more therapy, counseling, and parenting assistance. Throughout the case, they contend that Virgil has been a consistent caretaker. They argue that the court's opinion was speculative and was full of conjecture and was indicative of potential problems and that the evidence was not clear and convincing that the problems could not be remedied.

■ Termination of parental rights is an extreme remedy and in derogation of a parent's natural rights; however, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Fenstermacher v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 88, 426 S.W.3d 483. We review termination-of-parental-rights cases de novo. *Id.*

Grounds for termination of parental rights must be proven by clear and convincing evidence, which is that degree of proof that will produce in the finder of fact a firm conviction of the allegations sought to be established. *Id.*

Our inquiry is whether the trial court's findings that the facts were proven by clear and convincing evidence is clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In resolving the clearly erroneous question, we give due regard to the opportunity of the trial court to judge the credibility of the witnesses. *Id.*

In order for a court to terminate parental rights, the court must enter an order finding by clear and convincing evidence that it is in the best interest of the juvenile, taking into consideration the likelihood that the juvenile will be adopted if the termination petition is granted; and that potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parents. Ark.Code Ann. § 9–27–341(b)(3) (Supp.2011). In addition, the court must also find by clear and convincing evidence that one or more statutory grounds for termination exists. Ark. Code Ann. § 9–27–341(b)(3)(B) (Supp. 2011). However, proof of only one statutory ground is sufficient to terminate parental rights. *Fenstermacher, supra.*

As it pertains to Tammie, she admitted that she had her parental rights involuntarily terminated to four other children. Ark.Code Ann. § 9–27–341(b)(3)(ix)*(a)(4). Fenstermacher, supra.* As we stated previously, the court need only prove one statutory ground for termination.

As it pertains to both Tammie and Virgil, testimony was presented by Blaylock, the caseworker, that the children had been out of the home for twelve months. Tammie admitted to having a bipolar disorder and failing to stay on medication. The court noted that the substance-abuse issues had not been resolved and that Tammie had recently been arrested for DWI and had spent time in a mental-health facility. Virgil testified to being aware of Tammie's mental-health issues, but that he fails to adequately understand the damage of Tammie having unsupervised time with the children. Virgil was without any income, said he planned to apply for food stamps, and hoped to return to work. However, he stated that if he returned to his job, he would leave at 3:30 in the morning, returning at 7:30 at night thus leaving the children in the custody of Tammie when they were not in school. The court also noted the testimony of Virgil and Tammie that they had not provided stable housing. In fact, they had moved less than a month before the hearing, but Blaylock testified that he learned of their move at the termination hearing. Tammie, Virgil, and Blaylock all testified that Tammie and Virgil had missed several scheduled visitation appointments.

Based upon the evidence presented, we cannot say that the court order terminating parental rights is clearly erroneous.

Affirmed.

WYNNE and WOOD, JJ., agree.